**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL NO. 1:04CV27**

| | | |
|---|---|---|
| **MINUTE MAN ANCHORS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **OLIVER TECHNOLOGIES, INC., and** | ) | |
| **JAMES OLIVER, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

    **THIS MATTER** is before the Court on the Defendants' motion to dismiss or, in the alternative, to transfer.

## I.  PROCEDURAL HISTORY

    On February 11, 2004, Plaintiff Minute Man Anchors, Inc. (Minute Man) filed this action for declaratory judgment of noninfringement of a patent owned by Defendant James Oliver (Oliver) and licensed to Defendant Oliver Technologies, Inc. (OTI).  In addition, Plaintiff seeks a declaration that the patent is invalid.  The Defendants responded to the complaint by filing a motion to dismiss or, in the alternative, to transfer the action to the United States District Court for the Middle District of Tennessee.

## II. PENDING MOTIONS

Defendants' motion to dismiss is based on several grounds. First, they allege this Court does not have subject matter jurisdiction over the action because there is no actual case or controversy. **Fed. R. Civ. P. 12(b)(1).** They also allege that there is no personal jurisdiction over OTI or the individual Defendant. **Fed. R. Civ. P. 12(b)(2).** Defendants also claim that James Oliver and Evon Oliver[1] are indispensable parties as to whom this Court has no personal jurisdiction and, therefore, the case must be dismissed. **Fed. R. Civ. P. 12(b)(7), 19.**[2] In the alternative, Defendants move to transfer the case to Tennessee. The motions will be considered *seriatum*.

### A. The motion to dismiss pursuant to Rule 12(b)(1) for lack of an actual case or controversy

A motion to dismiss for lack of subject matter jurisdiction should be granted only if the material jurisdictional facts are undisputed and the moving party is entitled to prevail as a matter of law. ***Evans v. B.F. Perkins, Inc.*, 166 F.3d 642 (4th Cir. 1999).**

> Whether an actual case or controversy exists so that a district court may entertain an action for a declaratory judgment of non-infringement and/or invalidity is governed by Federal Circuit law. The determination of whether an actual controversy exists under the Declaratory Judgment Act in a patent case is a question of law[.] The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . [a court] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Paralleling Article III of the Constitution, the Act "requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment." "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse

---

[1]It is disclosed in the Defendants' pleadings that Evon Oliver is the wife of James Oliver.

[2]Defendants' brief erroneously cites Rule 12(b)(6).

legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." To keep watch over the subtle line between an "abstract question" and "a controversy contemplated by the Declaratory Judgment Act," an inquiry has been formulated that focuses on the conduct of both the patentee and the accused infringer. When a potential infringer seeks declaratory relief in the absence of a lawsuit by the patentee, there must be both (1) a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken with the intent to conduct such activity.

*MedImmune, Inc. v. Centocor, Inc.*, 409 F.3d 1376, 1378 (Fed. Cir. 2005) (quoting 28 U.S.C. § 2201(a); *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1331 (Fed. Cir. 2005); *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) (other internal citations omitted).

The complaint alleges that on October 21, 2003, United States Patent No. 6,634,150 (the '150 patent) was issued to James and Evon Oliver for an invention called "A Foundation with Lateral Brace for Manufactured Home." OTI is the non-exclusive licensee[3] of the patent and uses it in its manufacture and sale of the product described in the invention. Minute Man manufactures anchors and bracing systems for manufactured homes, including a product known as the "lateral bracing system." On December 19, 2003, Calif Tervo (Tervo), an attorney representing James Oliver, wrote to Minute Man as follows:

I am in receipt of a Minute Man Anchors, Inc. brochure featuring lateral bracing systems that *appear to infringe claims of the above-identified patent*. Please *inform me that you are removing forthwith the infringing lateral bracing systems from sale*, or, if you are of the opinion that your lateral bracing systems do not infringe the above-identified patent, please inform me as to the bases of that opinion. Under U.S. patent law, *it is illegal to make, use, offer for sale, or sell an infringing product. This letter puts you on notice of the patent. If a court finds infringement, my client may be awarded damages for losses and may also be awarded treble damages and attorney fees for infringement after notice.*

---

[3]However, the record does not disclose that Oliver has licensed the patent to any other licensee except OTI. In fact, the record discloses that OTI is the only licensee.

**Exhibit A,** *attached to* **Complaint for Declaratory Judgment, filed February 4, 2004**

**(emphasis added).**

Minute Man responded to the letter through its attorney, Cort Flint (Flint), on February

20, 2004. **Exhibit C,** *attached to* **Brief in Support of Defendants' Motion to Dismiss or**

**Transfer ["Defendants' Brief"], filed September 7, 2004.** Flint advised that in his

professional opinion the patent was invalid; however, assuming it was valid, the products

manufactured by Minute Man did not infringe the patent. *Id.* Flint explained in detail why

Minute Man's products were different from the patented invention. *Id.*

> All of your client's patent's independent claims contain the limitation of a beam
> connector for clamping to the top of an I-beam and pivotally attached to the top
> end of a lateral brace. As is shown in our client's advertisement you can see
> clearly that the upper bracket is not pivotally attached to the lateral brace and
> further, does not clamp on to the top part of the I-beam via the same means or
> produce or provide the same function.

*Id.* When Flint received no response from Tervo, he wrote again in early May 2004 asking if a

response would be forthcoming. **Exhibit D,** *attached to* **Defendants' Brief.** On May 19, 2004,

Tervo responded by distinguishing the points raised in Flint's letter and advising that "my

client's position is unchanged." **Exhibit E,** *attached to* **Defendants' Brief.** In other words,

Oliver still considered that Minute Man's products infringed his patent.

The language used by Tervo on behalf of the patentee in this case is stronger than that

used in *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1482 (Fed. Cir. 1998), a case in which

the Federal Circuit found "a letter threatening an infringement suit unless the alleged infringer

ceases the offending activity satisfies the first prong of the justiciability test." *Id.* In *Fina*, the

attorney advised that introducing the declaratory judgment plaintiff's product into the market

"would constitute infringement" of the patent at issue. *Id.* The attorney also warned that his

client vigorously protected the patent. *Id.* Here, the patentee's attorney stated that Minute Man's products "appear to infringe claims of the above-identified patent" but then described the products as "infringing" and requested advice "that you are removing forthwith the infringing lateral bracing systems from sale[.]" **Exhibit A,** *supra.* The attorney also warned Minute Man of impending litigation:

> Under U.S. patent law, it is illegal to make, use, offer for sale, or sell an infringing product. This letter puts you on notice of the patent. If a court finds infringement, my client may be awarded damages for losses and may also be awarded treble damages and attorney fees for infringement after notice. Please inform me that you are removing forthwith the infringing lateral bracing systems from sale[.]

*Id.* The letters from the patentee's counsel "manifest an ample-enough threat." ***Fina,*** *supra,* **at 1483;** ***Teva Pharms., supra,* at 1333 (the possibility of litigation must be imminent not conjectural).** Moreover, in the last letter received from the patentee's counsel, he reiterated that his "client's position [was] unchanged." Both the initial and later letters "signal[led] the defendants' continued intent to enforce their patents." ***Fina,*** *supra;* ***Sierra Applied Sci., Inc. v. Advanced Energy Indus., Inc.,* 363 F.3d 1361, 1375 (Fed. Cir. 2004) ("The broad accusations of the 1999 and 2000 letters embraced all potentially infringing activities[.]");** ***EMC Corp. v. Norand Corp.,* 89 F.3d 807, 811 (Fed. Cir. 1996) ("To put a putative infringer in reasonable apprehension of suit does not require an express charge of infringement and threat of suit; rather, such apprehension may be induced by subtler conduct if that conduct rises 'to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent,'** *i.e.,* **to initiate an infringement action.") (quoting** *Shell Oil Co. v. Amoco Corp.,* **970 F.2d 885, 887 (Fed. Cir. 1992));** ***Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed. Cir. 1988) ("In light of the subtleties in lawyer language . . . the courts have not required an express infringement charge[.]").**

Defense counsel argue that the delay between the first letter from Tervo in December 2003 and his May 19, 2004, response to the February 2004 letter from Flint shows that no suit was imminent by the patentee. They describe this lack of response as ongoing negotiation. The fact is, however, that Minute Man's attorney promptly responded to Tervo's December 2003 letter but received no reply. In May 2004, Minute Man's counsel wrote again. The fact that Tervo failed to promptly respond does not negate the valid concern on Minute Man's part that litigation might be imminent. Indeed, the failure to respond led to the conclusion that Oliver did not wish to resolve the matter but instead sought to litigate. This failure to respond, along with the clear threat of litigation in the December 2003 letter, is far more than a "purely subjective apprehension of an infringement suit[.]" ***Phillips Plastics Corp. v. Kato Hatsujou K.K.***, **57 F.3d 1051, 1053 (Fed. Cir. 1995).** And, despite the characterization of defense counsel that "amicable" discussions were underway throughout this period, the only information in the record consists of the December 2003 letter threatening suit, Flint's February 2004 letter requesting a reply from Tervo, Flint's May 2004 letter again requesting a reply from Tervo, and Tervo's somewhat terse reply on May 19, 2004, that his client's position remained unchanged.

> [O]ne who may become liable for infringement should not be subject to manipulation by a patentee who uses careful phrases in order to avoid explicit threats, thus denying recourse to the courts while damages accrue. . . . Indeed, the purpose of the Declaratory Judgment Act is to enable those threatened to remove such a cloud on their commercial activity, instead of being obliged to await the convenience of the threatening party.

***Id.*** Defense counsel argue that Tervo's language was not a clear threat. However, as noted above, Tervo's December letter contained a direct accusation of infringement and an explicit threat to initiate litigation, *albeit* through the use of "manipulative" and "careful" phrases. ***Id.***

His failure to respond to Flint's letter "obliged" Minute Man to "await the convenience of the threatening party." *Id.* The two-part test for declaratory judgment jurisdiction

> is designed to police the sometimes subtle line between cases in which the parties have adverse interests and cases in which those adverse interests have ripened into a dispute that may properly be deemed a controversy. The test for finding a "controversy" for jurisdictional purposes is a pragmatic one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling. The need to look to substance rather than form is especially important in this area, because in many instances (as in this case) the parties are sensitive to the prospect of a declaratory judgment action and couch their exchanges in terms designed either to create or defeat declaratory judgment jurisdiction. In the end, the question is whether the relationship between the parties can be considered a "controversy," and that inquiry does not turn on whether the parties have used particular "magic words" in communicating with one another. . . . An objective reader of [Tervo's December] 19 letter could only conclude that [Oliver] had already decided [Minute Man] was infringing its patent[] and that [Oliver] intended to file suit unless it could obtain satisfaction without having to sue.

*EMC*, 89 F.3d at 811-12. Under such circumstances, an actual controversy exists. *Id.*; *accord, Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95-96 (1993) ("Before the [Declaratory Judgment] Act, competitors victimized by th[e] tactic [of a patent owner brandishing a Damoclean threat with a sheathed sword] were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interest."). Moreover, the Court finds that considering the totality of the circumstances, Minute Man had a reasonable apprehension of infringement litigation on the part of Oliver. *EMC, supra; Arrowhead, supra.*

Defendants have not raised an issue as to the second prong of the test and, therefore, there is no need for discussion thereof. The Court finds, in sum, that an actual case or controversy exists among the parties.

**B.      The motion to dismiss for lack of personal jurisdiction**

Defendants move to dismiss for lack of personal jurisdiction, primarily arguing that neither James nor Evon Oliver has sufficient personal contacts with North Carolina to warrant the exercise of jurisdiction. In the reply to Minute Man's response, Defendants make a more expansive argument that OTI does not have sufficient contacts. Because Evon Oliver is not a named defendant, the issue is not addressed as to her.

Although the law of the Federal Circuit applies to issues of personal jurisdiction in a patent infringement action, *Rates Tech., Inc. v. Nortel Networks Corp.*, 399 F.3d 1302, 1307 (Fed. Cir.), *cert. denied*, 125 S. Ct. 2981 (2005),

> [t]he determination whether a district court has personal jurisdiction over the defendants in a patent infringement case generally involves two inquiries. First, does jurisdiction exist under the state long-arm statute?[4] Second, if such jurisdiction exists, would its exercise be consistent with the limitations of the due process clause? Sometimes these two inquiries coalesce into one because the reach of the state long-arm statute is the same as the limits of the due process clause, so that the state limitation "collapses into" the due process requirement.

**Trintec Indus., Inc. v. Pedre Promotional Prod., Inc., 395 F.3d 1275, 1279 (Fed. Cir. 2005) (internal citations omitted) (footnote added).**

---

[4]"A federal district court in North Carolina has personal jurisdiction over a nonresident defendant only if the North Carolina state court would have personal jurisdiction, even when the cause of action is purely federal." **Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc., 304 F.Supp.2d 769, 771 n.1 (M.D.N.C. 2004) (citing Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1569 (Fed. Cir. 1994)).**

9

With regard to the first requirement, [this Court] must accept as binding the interpretation of [North Carolina's] long-arm statute rendered by the [North Carolina] Court of Appeals.  The [North Carolina] courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution.  Thus, [the] statutory inquiry merges with [the] constitutional inquiry.  A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contact" with the forum, such that to require the defendant to defend its interests in that state "does not offend traditional notions of fair play and substantial justice."  The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit.  If those contacts form the basis for the suit, they may establish "specific jurisdiction."  In determining whether specific jurisdiction exists, [the Court] consider[s] (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff['s] claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable."  If, however, the defendant's contacts with the state are not also the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state.  To establish general jurisdiction, the defendant's activities in the state must have been continuous and systematic.

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Cen., Inc.*, 334 F.3d 390, 396-97 (4th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (other quotations and internal citations omitted); *accord, Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001) (citing North Carolina law).

James Oliver has provided an affidavit in which he avers the following: (1) he is the President of OTI; (2) he is an owner of the '150 patent; (3) while he has provided a "non-exclusive license" to OTI to manufacture, market and sell products relating to the '150 patent, he retained all his ownership rights to the patent; (4) in 1999, he came to North Carolina in connection with his company, J&E Trucking Services, Inc. (J&E), to meet with the owner of Minute Man to discuss the possibility of distributing each other's products; however, those

products did not involve the '150 patent;[5] (5) in 2003, he came to North Carolina to explore the purchase of a company. **Exhibit A, Declaration of James Oliver in Support of Motion to Dismiss or Transfer,** *attached to* **Defendants' Brief.**

Bert Moore is the Chief Financial Manager for OTI. **Exhibit B, Declaration of Bert A. Moore, III, in Support of Motion to Dismiss or Transfer,** *attached to* **Defendants' Brief.** OTI was incorporated in October 1995 but on June 27, 2003, it changed its corporate name to J&E. *Id.,* ¶ **3.** Although unclear, it appears that prior to June 2003, J&E and OTI both manufactured, sold and marketed the mobile home products. *Id.* OTI is a Delaware corporation with its principal place of business in Tennessee. *Id.,* ¶ **2.** J&E is incorporated outside of North Carolina and has its principal place of business outside of North Carolina. *Id.* From 1995 through 2001, J&E did not have any revenue from the sale of lateral bracing system devices to customers in North Carolina. *Id.,* ¶ **5.** In 2002, J&E sold $6,824.69 of lateral bracing system devices to customers in North Carolina. *Id.* That figure increased to $16,765 for the time period January 1 through June 20, 2003. *Id.* After that date, J&E ceased selling the systems since OTI took over that aspect of the business. *Id.* From June 2003 through August 2004, OTI generated $31,860.54 in revenue from its sales of lateral bracing system devices to customers in North Carolina.[6] *Id.* OTI is, however, a member of the North Carolina Manufactured Housing Association, which is a trade association; and, it has one independent sales representative located in North Carolina. *Id.,* ¶ **10m.** OTI has sent employees to installer schools located within North

---

[5]This is not surprising since the '150 patent was issued in 2003.

[6]In the Defendants' Objection to Plaintiff's Statement of Relevant Facts, filed under seal in November 2004, that figure was listed as $72,483.83 because it included other products. **Defendants' Objection to Plaintiff's Statement of Relevant Facts, filed November 19, 2004, at 9.** The total of all sales made by OTI in North Carolina was listed as $196,325.83. *Id.*

Carolina and OTI has made a number of sales presentations and demonstrations in North

Carolina. *Id.* Moore was also aware that North Carolina was a target market for OTI and

telephone solicitation was heavy into that state. **Exhibit D-1, Confidential Portion of**

**Deposition of Bert Moore,** *attached to* **Defendants' Objection to Plaintiff's Statement of**

**Relevant Facts ["Defendants' Objection"], filed November 19, 2004, at 3.** Certified installers

are the "main targets" within the state. *Id.* In addition to the telephone solicitations,

demonstrations of OTI products were carried out in North Carolina. *Id.* One or two employees

of OTI have traveled into North Carolina for demonstrations, perhaps up to ten times. *Id.***, at 4.**

Moore described this as a "campaign" within the state because North Carolina "might be in the

top 15 or 20 states that sets manufactured homes." *Id.***, at 5.** In addition to this connection with

the state, OTI also had a list of numerous vendors which sold products made in North Carolina to

the corporation. *Id.***, at 5-10.**

James Oliver is the president of OTI, a 50 percent owner, and a director. **Exhibit B,**

**Deposition Transcript of James Oliver,** *attached to* **Defendants' Objection, at 9.**[7] His wife is

the other 50 percent owner, vice-president and secretary, as well as a director. *Id.* Bert Moore is

the financial officer but there are no other directors. *Id.* Six of Oliver's children are employed

by OTI. *Id.* Oliver testified that he oversees the business activities. *Id.***, at 15-16.** OTI has at

least one employee who responds to inquiries which the company receives via the Internet. *Id.***,**

**at 19;** *see***,** *e.g. Christian Sci. Bd. of Dirs.***, 259 F.3d at 218 n.11.** Both All Steel Foundations

and a lateral bracing system are covered by the '150 patent and both products are shipped into

---

[7]To the extent that this opinion discloses in the public record certain facts which were
filed under seal, the disclosure is made because the Court finds that those matters are not truly
proprietary and no justification for filing this Order under seal exists.

North Carolina by OTI at Oliver's direction. **Oliver Deposition,** *supra***, at 19, 22.** Oliver testified that OTI does business with Oakwood Homes, a North Carolina corporation, and other North Carolina businesses.[8] *Id.***, at 19.** Oliver also testified that OTI has sought and obtained approval from the North Carolina governmental agencies, including the Department of Insurance, Office of State Fire Marshal, for permission to market its products in North Carolina. *Id.***, at 22.** Oliver testified that it was his intent to market his products in North Carolina; the products have, in fact, been marketed there; and OTI received his permission to do so. *Id.***, at 22-23.** Oliver sees no distinction between him individually and OTI; thus, legal representation of Oliver personally would inure to the benefit of OTI. *Id.***, at 41.** Oliver, both individually and as an officer of OTI, has authorized the marketing and sale of products in North Carolina. *Id.***, at 48; Exhibit B-1, Confidential Portion of Oliver Deposition,** *attached to* **Defendants' Objection, at 7.** Oliver and his wife decide where OTI products will be sold. *Id.* He authorized OTI to become licensed in North Carolina to sell. *Id.* He did this in both his individual and official capacity. *Id.* **("I gave the authorization to the company, Evon and I, personally, to sell, to authorize the company to sell in any state that we're working.").** On two occasions, Oliver, both individually and in his official capacity, authorized the sale of OTI's All Steel Foundation Systems in North Carolina. *Id.* Oliver is in *de facto* control of the corporation. **Oliver Deposition,** *supra***, at 49 ("Q: Have you, James Oliver, the individual, ever had an occasion to complain about anything that [OTI] has done because you're the president of it? A: No, I change it if I'm not happy with it.").** The letter which Tervo sent to Minute Man was sent at the direction of Oliver because he was concerned that there was infringement. *Id.***, at 25, 27.**

---

[8]In fact, the website maintained by OTI lists Oakwood Homes Engineering in North Carolina as a reference. ***See*, www.olivertechnologies.com/apads.htm.**

While the December 19, 2003, letter referred to Oliver in his individual capacity as the client, the second letter sent in May 2004 referenced OTI as the client. ***Id.*, at 42.** Oliver had previously been involved in such situations; and, in fact, he had responded to inquiries from other patent holders who thought Oliver and OTI might be infringing. ***Id.*, at 28.** Oliver felt it was necessary to have the letter sent by Tervo. ***Id.*** Oliver and his wife receive five percent of each sale made of the lateral bracing system. **Exhibit B-1, *supra*, at 9.**

OTI is "engaged in substantial activity within th[e] State [of North Carolina], whether such activity is wholly interstate, intrastate, or otherwise." **N.C. Gen. Stat. § 1-75.4(1)(d).** "To generate minimum contacts, the defendant must have acted in such a way so as to purposefully avail itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of the laws of North Carolina." ***Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 568, 671, 541 S.E.2d 733, 736 (2001).** Clearly, based on the fact that OTI targeted a North Carolina market, it should have "reasonably anticipate[d] being haled into" a North Carolina court. ***Id.*, at 672, 541 S.E.2d at 737 (citations omitted).** Likewise, the quantity, quality and nature of those contacts satisfy the minimum contacts test. ***Inspirational Network, Inc. v. Combs*, 131 N.C. App. 231, 240, 506 S.E.2d 754, 761 (1998).** OTI sent representatives into the state to conduct demonstrations and to go to school. It actively solicited sales within the state for its products which would then be, and were, shipped into the state. Revenue was generated to the corporation as a result of sales of its products to North Carolina customers. ***Tart v. Prescott's Pharm., Inc.*, 118 N.C. App. 516, 521-22, 456 S.E.2d 121, 126 (1995) ("A forum state does not exceed its authority under the Due Process Clause, 'if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.'") (quoting**

***World-Wide Volkswagen Corp. v. Woodson***, 444 U.S. 286, 298 (1980)); ***Fran's Pecans, Inc. v.***

***Greene***, 134 N.C. App. 110, 115, 516 S.E.2d 647, 651 (1999) ("By soliciting sales and selling

**products within North Carolina, defendant purposefully availed itself of the privilege of**

**conducting activities within the state with the benefits and protection of its laws.").**

Moreover, "North Carolina has an interest in providing a convenient forum for its citizens to seek

redress for injuries." ***Inspirational Network***, 131 N.C. App. at 241, 506 S.E.2d at 761. The

Court finds that specific jurisdiction exists over OTI because it has availed itself of the privilege

of conducting activities in North Carolina; Minute Man's claims arise out of those activities

directed at the state; and the exercise of personal jurisdiction would be constitutionally

"reasonable."

Defendants, however, claim there is no personal jurisdiction over James Oliver because

he has insufficient personal contacts with North Carolina to warrant the exercise of long-arm

jurisdiction. Minute Man acknowledges that the fact that Oliver directed the sending of the cease

and desist letter is, standing alone, insufficient to warrant the exercise of jurisdiction. ***See, e.g.,***

***Silent Drive, Inc. v. Strong Indus., Inc.***, 326 F.3d 1194 (Fed. Cir. 2003). Plaintiffs respond

that Oliver is the agent or alter ego of OTI. Minute Man does not argue that James Oliver's

conduct in his individual capacity is sufficient to warrant the exercise of jurisdiction. The Court

finds this omission confusing since the deposition testimony set forth *infra* combined with the

sending of the cease and desist letter are sufficient personal contacts to establish personal

jurisdiction. ***Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.***, 142 F.3d 1266, 1270 (Fed. Cir.

**1998) ("[T]he sending of infringement letters by the defendant-patentee to residents within**

**the forum state *coupled with the licensing* by the defendant of an in-state competitor of the**

**plaintiff warranted the exercise of jurisdiction of the defendant in the plaintiff's**

**declaratory judgment suit.")**.  "While a [closely held corporation licensee] is a legitimate creature and may provide certain business advantages, it cannot fairly be used to insulate patent owners from defending declaratory judgment actions in those fora where its parent company operates under the patent and engages in activities sufficient to create personal jurisdiction and declaratory judgment jurisdiction."  **Id., at 1271 (footnote omitted).**  Despite the fact that Minute Man did not made this argument, the Court must satisfy itself of its jurisdiction and thus finds that James Oliver's individual contacts are sufficient to warrant the exercise of personal jurisdiction.

Although the issue of alter ego becomes moot in view of the exercise of personal jurisdiction, the Court does note that when "faced with a choice-of-law question regarding the equitable remedy of piercing the corporate veil, the North Carolina Supreme Court would adopt the internal affairs doctrine and apply the law of the state of incorporation."  **DeWitt v. Hutchins, 309 F.Supp.2d 743, 751 (M.D.N.C. 2004).**  OTI was incorporated in Delaware.  In Delaware, however, the corporate veil may be pierced or an allegation of alter ego sustained only when some fraud or injustice is being perpetrated through misuse of the corporate form.  **Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, 2004 WL 415251, at *7 (Del. Ch. 2004); ACE & Co., Inc. v. Balfour Beatty PLC, 148 F.Supp.2d 418 (D. Del. 2001).**  "[T]he fraud or injustice must consist of something more than the alleged wrong in the complaint and relate to a misuse of the corporate structure."  **Medi-Tec, supra.**  Moreover, patent infringement is not sufficient to meet the requirement of fraud or injustice.  **Id., at n.57.**  "'Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.'"  **Mason v. Network of Wilmington, Inc., 2005 WL 1653954, at *3 (Del. Ch. 2005) (quoting Wallace ex rel. Cencom Cable Income Partners II, Inc. L.P. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999)).**  Although

the Plaintiff here claims that Oliver is in reality the controlling force behind the corporation, there is no allegation that OTI exists only as a vehicle for a fraudulent purpose. Under the standard set by Delaware law, the Plaintiff has not alleged facts sufficient to warrant either piercing the corporate veil or showing alter ego status.

The Court notes the outcome would be no different under North Carolina law.

[W]hen a corporation is operated in such a way that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the individual officer shareholder will be treated as one and the same person. . . . North Carolina courts have made clear, however, that
> [i]n a close corporation, the principal or sole stockholder [is] permitted by law to play an active role in management, [and] may deal with third parties without incurring personal liability, as long as the separate corporate identity is maintained.

Thus, the mere fact that the predominant or sole owner in a closely held corporation exerts significant control over the daily operations of the corporation is not enough to justify disregarding the corporate entity to impose individual liability on the owner.

*DeWitt*, 309 F.Supp.2d at 752-53 (quoting *Statesville Stained Glass v. T.E. Lane Constr. & Supply*, 110 N.C. App. 592, 597, 430 S.E.2d 437, 440 (2993)) (other citations omitted).

The Court, therefore, concludes that although personal jurisdiction as to Defendant James Oliver does exist, jurisdiction in the alter ego status would not.[9]

---

[9]Moreover, the complaint contains no allegations of any kind concerning agency or alter ego status or piercing the corporate veil. These allegations arose for the first time in response to the motion to dismiss.

**C.     The motion to dismiss for failure to join indispensable parties.**

Having found personal jurisdiction over OTI and James Oliver, the motion to dismiss for failure to join James Oliver as an indispensable party is moot.  It is not moot, however, as to Evon Oliver.  The Court finds as an alternative ruling that even if personal jurisdiction over James Oliver did not exist, he is not an indispensable party.  The same is true as to his wife.

The Defendants claim that since James and Evon Oliver own the patent, no action may proceed in their absence as necessary parties.  Since personal jurisdiction does not exist, they also argue that neither may be joined, and as a result, this action must be dismissed.

It is true that as a general rule, "United States patent law . . . requires that all co-owners normally must join as plaintiffs in an infringement suit."  ***Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1331 (Fed. Cir. 2001) (citations omitted).**  Thus, when an exclusive licensee sues a competitor for infringement, the patent owner must be joined as a party unless the license agreement provides that the right to sue lies with the licensee.  ***Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991).**  Since a non-exclusive patent licensee does not have such rights, it also does not have standing *to sue* for infringement.  ***Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372 (Fed. Cir. 2000); *Abbott Labs. v. Diamedix Corp.*, 1994 WL 782247, at \*3 n.3 (Fed. Cir. 1994).**

But these situations do not address the facts at hand.  Here, the competitor has sued the licensee for declaratory judgment.  While OTI is a non-exclusive licensee, no party has presented any facts showing there are any other licensees, exclusive or otherwise.  And, this Court has personal as well as subject matter jurisdiction over OTI.  To accept the Defendants' argument that this case must be dismissed because the patent owners may not be joined as *defendants* would effectively leave the Plaintiff with no remedy in the Court which it chose as its forum;

however, the law is well settled that "the plaintiff is the master of the complaint." ***Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.***, **535 U.S. 826, 831 (2002).** In fact, granting the Defendants' motion would force Minute Man to sue in Tennessee, which, of course, goes to the last motion by the Defendants for a transfer to a different venue. This Court does not accept that the vagaries of patent law should merit such an injustice. Indeed, "[w]hether a party is indispensable under Rule 19(b) is a matter of regional circuit law[.]" ***Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.***, **142 F.3d 1266, 1269 (Fed. Cir. 1998).**

> Federal Rule of Civil Procedure 19 sets forth a two-step inquiry for a district court to determine whether a party should be joined in an action. First, the district court must determine whether the party is "necessary" to the action under Rule 19(a).[10] If the Court determines that the party is "necessary," it must then determine whether the party is "indispensable" to the action under Rule 19(b).[11] . . .

---

[10]Rule 19(a) provides in pertinent part:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest[.]

**Fed. R. Civ. P. 19(a).**

[11]Rule 19(b) provides in pertinent part:

> If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and in good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the Court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

"Dismissal of a case is a drastic remedy, however, which should be employed only sparingly." In determining whether to dismiss a complaint [for failure to join], a court must proceed pragmatically, "examin[ing] the facts of the particular controversy to determine the potential for prejudice to all parties, including those not before it."

**Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of South Carolina, Inc.**, 210 F.3d 246, 249-50 (4th Cir. 2000) (quoting **Teamsters Local Union No. 171 v. Keal Driveway Co.**, 173 F.3d 915, 918 (4th Cir. 1999)) (footnotes added).

Here, James and Evon Oliver are necessary parties because they are the patent owners and, in their absence, complete relief cannot be accorded. While OTI is the licensee, any declaration of noninfringement or invalidity of the patent goes to the interest of the patent owner. Indeed, it was James Oliver who directed the letter to be sent which threatened litigation. However, the fact that the Olivers are necessary parties does not automatically mean that they are indispensable parties pursuant to Rule 19(b).

"'A Rule 19(b) analysis is not mechanical; rather it is conducted in light of the equities of the case at bar.'" **Id.**, at 252 (quoting **Schlumberger Indus., Inc. v. Nat'l Sur. Corp.**, 36 F.3d 1274, 1287 (4th Cir. 1994)). The first Rule 19(b) factor is whether any judgment rendered in the Olivers' absence would prejudice them, OTI or Minute Man. "Since the introduction of Fed. R. Civ. P.19 and the 1966 amendments to the rule, however, 'courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of the patent []owner.'" **E-Z Bowz, LLC v. Prof'l Prod. Research Co.**, 2003 WL 22064257, at *3 (S.D.N.Y. 2003) (quoting **Michaels of Oregon Co. v. Mil-Tech Inc.**, 1995 WL 852122, at *2 (D. Ore. 1995)). The undersigned cannot find that failure to join either or both of the Olivers would prejudice them since any judgment will not

---

**Fed. R. Civ. P. 19(b).**

bind them as licensors-patentees since they could sue Minute Man at any time thereafter. ***A.L. Smith Iron Co. v. Dickson*, 141 F.2d 3 (2d Cir. 1944).** Moreover, Evon Oliver is free to intervene in this action at any time. ***Id.*** In fact, the Olivers' interest in dismissing this complaint lies primarily in the choice of forum, which is "an interest proper to be weighed against the plaintiff's interest in settling its present controversy with [the licensee, but it is nullified] for it would be obviously unfair to leave [Minute Man's] business exposed to continuous indirect attack, merely to preserve [the licensor-patentee's] choice of forum[.]" ***Id.*, at 6.**

Nor does the Court find that the Olivers will be effectively absent from the litigation. James Oliver is the president of OTI, in day-to-day control of its operations, and, obviously, in charge of protecting its legal interests since he issued the directive to send the cease and desist letter.[12] ***Capri Jewelry Inc. v. Hattie Carnegie Jewelry Enter., Ltd.*, 539 F.2d 846, 853 (2d Cir. 1976).** Oliver testified that there is no distinction between him individually and OTI. Indeed, he testified that his attorney represented both of their interests. This fact is borne out by the attorney's reference of OTI as the client on the second cease and desist letter.

> Counsel representing [OTI] in this suit are acting both for it and for James in the infringement suit. The judgment of non-infringement will not be binding or work as a collateral estoppel on James (although it will, of course, be damaging as a precedent) unless he has controlled or substantially participated in the presentation[.] . . . [I]t is equally true that James, . . . could have defended here.

***Id.*** Indeed, OTI will adequately represent James Oliver's interests, as the interests of the two are identical. ***Nat'l Union*, 210 F.3d at 251 ("A court should hesitate to conclude, however, that a litigant can serve as a proxy for an absent party unless the interests of the two are identical.").**

---

[12]Indeed, he did so over the objection of his wife, the co-owner of the patent.

[P]rejudice to an absent party is mitigated when the interests of that party are "adequately protected by those who are present."  If so, the "person is not indispensable."  Here, [Oliver's] interests are adequately protected by [OTI], a party that [is] own[ed by Oliver and his wife] in its entirety . . . and that has manifested its obvious concern over the maintenance of [Oliver's] patents. [Oliver] and [OTI] share the common goal of assuring that the ['150] patent not be held invalid or be infringed by [Minute Man] and have jointly sought legal assistance in furtherance of that goal.  Courts have expressed the view that, under these circumstances, an argument that the patent[] owner is indispensable under Rule 19(b) is "wholly unconvincing[.]"

> Indeed, because the same attorney who represents [the licensee] in this action would apparently also represent [the patent[] owner] if it intervened, the presence of [the patent[] owner] would not change the course of the action in the slightest degree.

Moreover, to the extent [Oliver] would be prejudiced if the suit were to proceed in [his] absence, [Oliver] may intervene in the suit, and this "opportunity to intervene may be considered in calculating [any] prejudicial effect."

***Dainippon Screen*, 142 F.3d at 1272 (quoting *In re Allustiarte*, 786 F.2d 910, 919 (9th Cir. 1986); *Micro-Acoustics Corp. v. Bose Corp.*, 493 F. Supp. 356, 361 (S.D.N.Y. 1980); *Takeda v. Northwestern Nat'l Life Ins. Co.*, 765 F.2d 815, 820 n.5 (9th Cir. 1985)).**  The Court finds that no prejudice will, in reality, result but that it will be able to fashion any relief granted to avoid prejudice to James Oliver.

The third factor to be considered pursuant to Rule 19(b) is whether the judgment rendered in the absence of James Oliver will be adequate.  "This factor implicates 'the interest of the courts and the public in complete, consistent and efficient settlement of controversies.'"  ***Nat'l Union*, 210 F.3d at 253 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968)).**

> [T]his factor favors dismissal if there exists another forum in which all parties could be joined in the suit.  Accordingly, defendants argue that [Minute Man] could apparently maintain a suit in a forum where personal jurisdiction over [Oliver] would be proper, presumably the district of [Tennessee] . . . .  However, the fact that an alternative forum exists does not automatically warrant dismissal of the case given Rule 19(b)'s mandate to consider all of the relevant factors and the equities of the situation. . . .  No sound reason has been argued . . . for

> dismissing a declaratory judgment action against a [closely held corporation licensee] operating under the patent on the ground that its [patent owner] is an indispensable party.

*Dainippon Screen*, **142 F.3d at 1273.**  The Court finds that James Oliver is not an indispensable party.  The same reasoning applies to his wife, Evon, the co-owner of the patent.  Evon testified that she is represented by the same attorney as James and that her interests are adequately protected by her husband and that attorney.  **Exhibit C, Deposition of Evon Oliver,** *attached to* **Defendants' Objection, at 10-16.**  Evon did not believe that, at the time of the letters, Minute Man's product actually infringed her patent but would relinquish that decision to the patent attorneys.  *Id.*  Moreover, as previously noted, she disagreed with the sending of the cease and desist letter.  Since she is not a party to this action, she has no participation in the defense of this litigation which is being handled by her husband and attorney.  *Id.*

> Thus, where the co-owner of a patent or other entity or individual whose interest in a patent might be directly affected by litigation has specifically disclaimed all interest in pursuing litigation related to the patent in favor of the party who has [sent the infringement letter], courts have held that joinder of the co-owner or other entity or individual is not necessary.

*Agilent Tech., Inc. v. Micromuse, Inc.*, **2004 WL 2346152, at *7 (S.D.N.Y. 2004) (citing** *Vaupel Textilmaschinen*, **944 F.2d at 875-76).**  As a result, the motion to dismiss is denied.


**D.      The motion to transfer venue.**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought."  **28 U.S.C. § 1404(a).**  An action for patent infringement may be brought "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has

a regular and established place of business."[13]  **28 U.S.C. § 1400(b).**  "Venue in a patent action

against a corporate defendant exists wherever there is personal jurisdiction."  ***Trintec Indus. v.***

***Pedre Promotional Products, Inc.***, **395 F.3d 1275, 1280 (Fed. Cir. 2005) (citations omitted);**

***VE Holding Corp. v. Johnson Gas Appliance Co.***, **917 F.2d 1574, 1583 (Fed. Cir. 1990) (The**

**first test for venue in a patent case where the defendant is a corporation is whether the**

**defendant is subject to personal jurisdiction in the district of the state where the action is**

**commenced.).**  And, while the law of the Federal Circuit is applied to determine the issue of

proper venue, the law of the regional circuit is used to determine whether a transfer of venue is

appropriate.  ***Regents of the Univ. of California v. Eli Lilly & Co.***, **119 F.3d 1559, 1564-65**

**(Fed. Cir. 1997);** ***Injen Tech. Co., Ltd. v. Advanced Engine Mgmt.***, **270 F.Supp.2d 1189,**

**1192-93 (S.D. Cal. 2003).**

Because there is personal jurisdiction over OTI in North Carolina, venue here is proper.

The question then becomes whether it is appropriate to transfer the action to Tennessee.  "The

moving party bears the burden of showing that transfer to the requested forum is proper."  ***Cole-***

***Tuve, Inc. v. American Machine Tools Corp.***, **342 F.Supp.2d 362, 369 (D. Md. 2004)**

**(citations omitted).**

The parties do not dispute that the case could have been brought in the Middle District of

Tennessee.  ***Volvo Construction Equip. North America v. CLM Equip. Co., Inc.***, **386 F.3d 581,**

---

[13]The parties argue the point of whether § 1400(b) or § 1391(b) applies to a declaratory judgment action in a patent case.  *See, e.g.*, *VE Holding Co.*, **917 F.2d at 1583 ("It has long been held that a declaratory judgment action alleging that a patent is invalid and not infringed – the mirror image of a suit for patent infringement – is governed by the general venue statutes, not by § 1400(b).");** *U.S. Aluminum Corp. v. Kawneer Co., Inc.*, **694 F.2d 193 (9th Cir. 1982);** *Meteoro Amusement Corp. v. Six Flags*, **267 F.Supp.2d 263, 266 (N.D.N.Y. 2003).**  The Court finds the distinction moot in view of clearly established law that venue is proper in any district in which there is personal jurisdiction over the defendant corporation.

**592 (4ᵗʰ Cir. 2004) (The first factor for consideration is whether venue would be proper in the transferee district.).** Thus, the Court moves to the issue of whether it is appropriate to transfer the action to that court. In making that determination, the following factors are weighed: (1) the Plaintiff's choice of forum; (2) the residence of the parties; (3) the relative ease of access of proof; (4) the availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses; (5) the possibility of a view; (6) the enforceability of any judgment obtained; (7) the relative advantages and obstacles to a fair trial; (8) other problems which might make the litigation more expeditious and economical; (9) the administrative difficulties of court congestion; (10) the interest in having localized controversies resolved at home; and (11) the avoidance of issues involving conflict of laws. ***Rice v. BellSouth Advertising & Pub. Corp.*, 240 F.Supp.2d 526, 529 (W.D.N.C. 2002).**

Considering first the Plaintiff's choice of forum, "'[a] plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice . . . should not be lightly disturbed.'" ***Id.*, at 530 (quoting *Datasouth Computer Corp. v. Three Dimensional Tech., Inc.*, 719 F. Supp. 446, 451 (W.D.N.C. 1989)).** "[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." ***Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981).** The considerable weight accorded a plaintiff's choice of forum should be modified if none of the conduct complained of occurred in the forum and the forum has no connection with the matter in controversy. ***Cole-Tuve*, 342 F.Supp.2d at 370.** That is not the case here as the patented products have been sold in North Carolina which has a firm connection with the matter in controversy. Minute Man's products are manufactured in North Carolina, *albeit* not exclusively so, and sold here. OTI ships its products

into the State and has targeted North Carolina as a valuable market. North Carolina has a strong interest in "'providing effective means of redress for its residents,' here a . . . local business[.]" ***First American First, Inc. v. Nat'l Ass'n of Bank Women***, 802 F.2d 1511, 1517(4ᵗʰ Cir. 1986) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). This factor weighs heavily in favor of Minute Man's choice of forum.

The next factor, residence of the parties, also weighs in favor of Minute Man. While the Defendants now claim that Minute Man is actually a Florida corporation, no one disputes that its principal place of business is in North Carolina. The company president testified that it is "totally located in East Flat Rock," North Carolina. **Exhibit A, Deposition of Albert Moreno, Jr., *attached to* Defendants' Objection, at 33-34.** The business is managed from North Carolina and manufacturing of its products occurs in North Carolina. The business owns warehouses, buildings, land and equipment in North Carolina. Its accounting, sales, manufacturing and shipping occurs in North Carolina. Thus, its records and documents are located in North Carolina.

> The preferred forum in patent infringement cases is generally "the center of the accused activity," which is often where the offending device is produced. . . . [T]he "preferred forum" [is] the place of production because that's where "the milieu of the infringing device" [is] located. "It must be remembered that Congress contemplated [in patent cases] a venue where there would be first-hand visual and audible knowledge of the conditions, the environment and the art itself, and testimony of the most competent witnesses."

***Agilent Tech.***, 316 F.Supp.2d at 327 n.3 (quoting *Acterna LLC v. Adtech, Inc.*, 129 F.Supp.2d 936, 939 (E.D. Va. 2001); *AMP, Inc. v. Burndy of Midwest, Inc.*, 340 F. Supp. 21 (N.D. Ill. 1971)) (other citations omitted). Since Minute Man seeks a declaration that its products do not infringe the '150 patent, the "center of the accused activity" is in North Carolina.

"Further, a court should not transfer venue if the transfer would simply shift the inconvenience from one party to another." ***Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.***, **304 F.Supp.2d 769, 773 (M.D.N.C. 2004) (quotations omitted).** Such would be the case here. Minute Man's witnesses are located in North Carolina; OTI's witnesses are located, for the most part, in Tennessee. Although the Defendants claim that process cannot issue from this Court to reach Tennessee witnesses, it has been the experience of the Court that during litigation, parties, and their employees, voluntarily submit to depositions and that attorneys frequently travel to the witness in order to avoid great expense and inconvenience. Thus, the access to Minute Man's evidence is in North Carolina while that of the Defendants is in Tennessee. The same applies to the witnesses. The Court cannot find that this factor weighs in the Defendants' favor.

The possibility of a jury view is not at issue. It also appears that the enforceability of any judgment is a neutral factor. "Because this case arises under federal patent law, the court's familiarity with the applicable law is not at issue, as this Court is no better or worse equipped to handle this subject matter than any other United States district court." ***Agilent***, **316 F.Supp.2d at 329 (citing *Acterna, supra*, at 940).** The docket conditions of this Court certainly weigh in favor of Minute Man. Even patent cases are channeled for an expeditious trial as soon as motions to dismiss are concluded and the pretrial order and case management plan is entered. The Court concludes that the interests of justice and convenience warrant retaining the venue in the forum of Plaintiff's choice.

### III.  ORDER

**IT IS, THEREFORE, ORDERED** as follows:

1.      the motion of the Defendants OTI and James Oliver to dismiss is hereby **DENIED**;

2.      the motion of Defendants OTI and James Oliver to transfer is hereby **DENIED**;

3.      on or before 15 days from entry of this Order, Evon Oliver shall advise the Court by pleading whether she seeks leave to intervene in this action;

4.      the Court will not entertain a motion to reconsider from the Defendants absent an extraordinary ground for relief not presented in the pleadings before the Court.

**IT IS FURTHER ORDERED** that the Defendants file answer within 40 days from entry of this Order and that the Clerk of Court schedule a pretrial conference before the undersigned (should the parties request a formal conference) after receipt of the Defendants' answer and the parties' report of initial attorney conference.

**Signed: August 5, 2005**

Lacy H. Thornburg
United States District Judge